## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UPMC PRESBY SHADYSIDE,    )
                            )
           Plaintiff,    )    1:05-cv-68
       v.                )
                            )
WHIRLEY INDUSTRIES, INC.,    )
et al.,                     )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.

      This case comes before the Court having been removed from the Court of Common Pleas of Allegheny County, Pennsylvania.  Plaintiff's complaint asserts common law breach of contract claims against Defendants Whirley Industries, Inc. ("Whirley") and Benefits Services, Inc. ("BSI") arising from Plaintiff's efforts to recoup certain medical expenses incurred in connection with the treatment of one of Whirley's employees.  Defendants filed a motion to dismiss the complaint, and Plaintiff has moved to remand the matter to the Court of Common Pleas.  For the reasons that follow, Defendants' motion to dismiss will be denied and Plaintiff's motion to remand will be granted.

## I. BACKGROUND

      Plaintiff, UPMC Presby Shadyside ("UPMC"), is a Pennsylvania corporation operating as a hospital in Pittsburgh.  Whirley is a Pennsylvania corporation which operates out of Warren, Pennsylvania and provides traditional health insurance coverage or self insured health care coverage for its employees.  BSI acts as the agent and third party administrator on behalf of Whirley for purposes of processing and administering health care coverage to Whirley's employees.

      During the time period from November 30 through December 23, 2003, one of

Whirley's employees sought medical treatment at UPMC.  The employee in question was a participant in the "Whirley Industries, Inc. Employee Benefit Plan" prepared and administered by BSI.  On December 23, 2003, UPMC mailed claims to BSI in the amount of $226,732.75 relative to the employee's treatment.  Partial payments of $70,000.00 and $50,059.92 were made to UPMC on January 30, 2004 and March 12, 2004, respectively.

In total, UPMC claims that Defendants improperly discounted some $106,672.83 from the payments due.  According to UPMC, the deficiency results from a combination of two types of discounts, both of which UPMC contends were improperly taken, *to wit:* (i) discounts taken for timely payment (which payments, according to UPMC, were in fact untimely) and (ii) discounts taken based upon Defendants' own conclusion, following an independent audit, that certain of UPMC's charges exceeded that which is "reasonable and customary."

UPMC contends that, in taking the allegedly improper discounts, Defendants breached the terms of a "Memorandum of Understanding" ("MOU") to which UPMC and Crawford Health Plan/Vantage ("Vantage"), a Preferred Provider Organization ("PPO") are signatories.  (See Ex. A to Pl.'s Br. in Supp. of Remand [Doc. # 6].)  UPMC represents that it commonly offers prompt payment discounts through PPOs, which then enter into repricing contracts and negotiate volume-based discounts on behalf their clients (presumably, companies like Whirley) who generally lack the patient volume to be able to negotiate discounts independently.  According to UPMC, the negotiated discounts are typically leased by the PPO to its client base.  (See Pl.'s Br. in Supp. of Remand and in Opp. to Removal [Doc. # 6] at unnumbered p. 2.)

By its terms, the MOU applies to "[Vantage's] self-funded employer groups" for "covered services" received at UPMC and allows for a 20% discount of UPMC's billed charges if payment is received within thirty (30) days after billing.  (Id.)  In relevant part,

2

the MOU states as follows:

> Effective March 1, 2000, this Memorandum of Understanding (MOU) is entered into between UPMC Presbyterian and UPMC Shadyside (herein referred to as "provider") and Crawford Health Plan/Vantage (herein referred to as "PPO") and confirms our intention of formalizing a signed contract.
>
> The terms of this MOU shall apply to PPO's self-funded employer groups for covered services received at Provider.
>
> 1.      Inpatient and outpatient claims will [be] paid at 80% of Provider's billed charges.
>
> 2.      PPO shall remit payment on clean claims to Provider within thirty (30) calendar days of the receipt of the billing statement, including all interim bills.  Interim bills are produced every fourteen (14) days or upon the accumulation of $75,000 in posted charges.  If payment is not made within the thirty (30) calendar day period, all discount arrangements will be considered null and void and Provider's customary charges shall be due.
>
> ***
>
> 4.      PPO agrees to comply with Provider's Chart Audit Policies, attached as Exhibit I and Exhibit II.
>
> 5.      Neither Provider nor PPO may assign, transfer or subcontract its obligations under this MOU to another party without the written consent of both parties.
>
> 6.      Provider agrees to send Claims to:
>
>              Vantage Health Care Network
>
> ***
>
> This MOU shall be in effect until such time as PPO and Provider enter into the Definitive Agreement; provided however, that either party may terminate this MOU at any time upon not less than thirty (30) days prior written notice to the other party.  ***

(Id.)

On February 8, 2005 UPMC sued Whirley and BSI in the Allegheny County Court of Common Pleas, asserting one claim against each Defendant for alleged breach of contract.  Defendants then removed the action to this Court on the theory that UPMC's claims are subject to complete preemption under the civil enforcement provision of ERISA, 29 U.S.C. § 1132.  Defendants now argue that UPMC's claims must be dismissed due to its failure to have exhausted its administrative remedies under ERISA.  UPMC denies that complete preemption applies and moves to remand the action back to state court.

## II.  DISCUSSION

A civil action filed in state court is removable to federal court if the claim is one "arising under" federal law.  28 U.S.C. §§ 1331, 1441(a).  See Pascack Valley Hospital, Inc. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 398 (2004), *petition for cert. filed,* 73 USLW 3661 (Apr. 29, 2005)(NO. 04-1452).   Under the "well-pleaded complaint" rule, the plaintiff is generally entitled to remain in state court provided the complaint does not affirmatively allege a federal claim on its face.  Id. (citing Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6 (2003)).  To support removal, a right or immunity created by the Constitution or federal law must be an essential element of the plaintiff's cause of action.  Id. (quoting Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 10-11 (1983)).

Because federal preemption is normally considered a defense to suit, it is not construed as appearing on the face of a well-pleaded complaint, and therefore does not generally authorize removal to federal court.  Metropolitan Life Ins. co. v. Taylor, 481 U.S. 58, 63 (1987); Pascask Valley Hosp., 388 F.3d at 398.  However, an exception supporting removal exists if the civil action "falls within the narrow class of cases to which the doctrine of 'complete preemption' applies."  Pascask Valley Hosp., at 399 (citing Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S. Ct. 2488, 2494 (2004); Metro Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64 (1987)).  This doctrine recognizes that "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character."  Id. (quoting Taylor, 481 U.S. at 63-64).  That is because "[w]hen the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."  Anderson, 539 U.S. at 8.

Section 502(a) of ERISA – the statute's civil enforcement provision – is one such

4

provision "with such 'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" Pascask Valley Hosp., 388 F.3d at 399-400 (quoting Davila, 124 S. Ct. at 2495). In relevant part, § 502(a) allows an ERISA plan "participant" or "beneficiary" to file a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Thus, state law actions that are within the scope of § 502(a) are removable to federal court. Pascack, 388 F.3d at 399-400 (citations omitted).

The question for this Court is whether Plaintiff has asserted claims falling within ERISA's civil enforcement provision such that the doctrine of complete preemption applies. In determining whether a plaintiff has artfully pled his suit so as to couch a federal claim in terms of state law, we are permitted to look beyond the face of the complaint. Pascack, 388 F.3d at 400 (citing Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 268, 274 (3d Cir. 2001)). See also AETNA Health, Inc. v. Davila, 542 U.S. 200, — , 124 S. Ct. 2488, 2496 (2004) (to determine whether a cause of action falls within the scope of § 502(a)(1)(B), courts must examine the complaint, the statute on which the state law claims are based, and the various plan documents).

Recently, the Supreme Court revisited the topic of complete preemption in AETNA Health Inc. v. Davila, *supra.* Davila involved consolidated cases in which two individuals, Juan Davila and Ruby Calad, sued their respective HMOs for alleged failures to exercise ordinary care in the handling of coverage decisions, thereby allegedly violating the Texas Health Care Liability Act (THCLA). Davila's claim arose out of his HMO's refusal to pay for Vioxx after it was prescribed by his treating physician. Calad's claim arose from her HMO's refusal to pay for an extended hospital stay despite her physician's recommendation that she remain hospitalized for an

5

extended period following surgery.  The Supreme Court was asked to decide whether these state law claims fell within the scope of § 502(a)(1)(B) of ERISA, such that they would be completely preempted.

The Court noted, with respect to ERISA's civil enforcement provision:

> This provision is relatively straightforward.  If a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits. A participant or beneficiary can also bring suit generically to "enforce his rights" under the plan, or to clarify any of his rights to future benefits. Any dispute over the precise terms of the plan is resolved by a court under a *de novo* review standard, unless the terms of the plan "giv[e] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  ...

> It follows that if an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls within the scope of ERISA § 502(a)(1)(B). ...  In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).

Davila, at 2497 (internal quotation and citation omitted).  Applying this standard, the Supreme Court observed that both plaintiffs' claims involved the denial of coverage allegedly promised under their respective ERISA-regulated benefit plans.  The Court concluded that the claims were completely preempted by § 502(a)(1)(B).

Soon after Davila was decided by the Supreme Court, the Third Circuit was faced with an assertion of § 502(a) pre-emption in Pascack Valley Hospital, Inc. v. Local 464A UFCW Welfare Reimbursement Plan, *supra*.  In Pascack Valley Hospital, the plaintiff was part of a network of hospitals that had agreed to accept discounted payment for medical services provided to beneficiaries of group health plans in exchange for the plans' promise to encourage beneficiaries to use network hospitals.  Pursuant to this scheme, the network hospitals, including the plaintiff, did not contract directly with the plans, but instead entered into individual contracts with MagNet, Inc., an independent

6

consultant, which in turn entered into separate individualized contracts with the various plans.  The dispute in the case focused on a 1995 "Subscriber Agreement," which MagNet had entered into with the defendant, Local 464A UFCW Welfare Reimbursement Plan (the "Plan").  Under the terms of the Subscriber Agreement, the Plan had to remit payment to the Pascack Valley Hospital for "covered services" rendered to "eligible persons" within a 30-day window or else the discounted rate offered by the hospital would be forfeited.  See 388 F.3d at 396.  The underlying dispute arose from medical services that were rendered in 1999 to two individuals who were eligible for coverage under the defendant Plan.  After the Hospital submitted its claims for those services, the Plan remitted payment based upon the discounted rate.  The Hospital subsequently sued the Plan for alleged breach of the Subscriber Agreement on the theory that the Plan's payments had been made outside of the 30-day window and thus had been improperly discounted.  The Plan removed the suit to federal court and the Hospital moved to remand.

The question facing the court of appeals was whether the Hospital's claims were completely preempted by § 502 of ERISA such that removal of the case to federal court was proper.  The court began its analysis with Davila's premise that the case was removable "only if (1) the Hospital could have brought its breach of contract claim under § 502(a), and (2) no other legal duty support[ed] the Hospital's claim."  Id. at 400.  The court of appeals first concluded that the Hospital, being neither a "participant" nor a "beneficiary" under the Plan, could not have brought its claims under ERISA because it lacked standing.  The court declined to resolve whether, as a matter of law, the Hospital could have obtained § 502(a) standing by virtue of an assignment from the relevant participant or beneficiary since there was no evidence indicating that, in fact, such an

7

assignment had occurred.[1]  Id. at 400-401.

The court of appeals next concluded that the Hospital's state law claims were predicated on a legal duty independent of ERISA.  The court acknowledged that the Hospital's claims derived from an ERISA plan and existed "only because" of that plan. Id. at 402 (quoting Davila, supra, at 2500).  But the "crux" of the dispute, the court noted, was the meaning of § 2.1 of the Subscriber Agreement, governing payment for "Covered Services furnished to Eligible Persons."  "Were coverage and eligibility disputed in this case," the court wrote, "interpretation of the Plan might form an 'essential part' of the Hospital's claims."  Id. at 402.

> Coverage and eligibility, however, are not in dispute.  Instead, the resolution of this lawsuit requires interpretation of the Subscriber Agreement, not the Plan.  The Hospital's right to recovery, if it exists, depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself.

Id. at 402.  The court found instructive the decision of the Ninth Circuit Court of Appeals in Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc., 187 F.3d 1045 (9th Cir. 1999):

> In [Anesthesia Care Associates], the court held that claims asserted by health care providers against a health care plan for breach of their provider agreements were not completely pre-empted under ERISA. Id. at 1051-52. The court reached this conclusion notwithstanding "the fact that these medical providers obtained assignments of benefits from beneficiaries of ERISA-covered health care plans." Id. at 1047, 1052.
>
> The litigation in Anesthesia Care arose from a fee dispute between four health care providers and Blue Cross. Id. at 1048. Blue Cross had entered into "provider agreements" with physicians in which Blue Cross agreed to identify the providers in the information it distributed to beneficiaries of the plan and to direct beneficiaries to those providers. In return, the providers agreed to accept payment for services rendered to

---

[1] The court noted, however, that "[a]lmost every circuit to have considered the question has held that a health care provider can assert a claim under § 502(a) where a beneficiary or participant has assigned to the provider that individual's right to benefits under the plan."  388 F.3d at 401 n. 7 (citing Tango Transport v. Healthcare Fin. Servs., 322 F.3d 888, 891 (5th Cir. 2003) (collecting cases)).

beneficiaries according to specified fee schedules.  When Blue Cross attempted to change the fee schedules, the providers filed a class action in state court alleging a breach of the provider agreements.  Id. at 1049.  The Ninth Circuit held that "the Providers' claims, which arise from the terms of their provider agreements and could not be asserted by their patient-assignors, are not claims for benefits under the terms of ERISA plans, and hence do not fall within § 502(a)(1)(B)."  Id. at 1050.  The court explained:

> [T]he Providers are asserting contractual breaches... that their patient-assignors could not assert:  the patients simply are not parties to the provider agreements between the Providers and Blue Cross. The dispute here is not over the right to payment, which might be said to depend on the patients' assignments to the Providers, but the amount, or level, of payment, which depends on the terms of the provider agreements.

> Id. at 1051 (first emphasis added). Because the Providers asserted "state law claims arising out of separate agreements for the provision of goods and services," the court found "no basis to conclude that the mere fact of assignment converts the Providers' claims into claims to recover benefits under the terms of an ERISA plan."  Id. at 1052.

The Third Circuit found important similarities between the facts in Pascack Valley Hospital and those involved in the Anesthesia Care Associates case:  "(1) the Hospital's claims in [Pascack Valley] arise from the terms of a contract - the Subscriber Agreement - that is allegedly independent of the Plan; (2) the participants and beneficiaries of the Plan do not appear to be parties to the Subscriber Agreement; and (3) '(t)he dispute here is not over the *right* to payment, which might be said to depend on the patients' assignments to the (Hospital), but the *amount*, or level, of payment, which depends on the terms of the (Subscriber Agreement).'"  Id. at 403-04 (quoting Anesthesia Care Associates Medical Group, Inc., *supra*, at 1051) (alterations and emphasis in the original).

Defendants in this case contend that the reasoning of Pascack Valley militates against a remand and in favor of exercising federal jurisdiction in this case.  We do not agree.  Under Davila and Pascack Valley Hospital, as we have seen, complete preemption applies only if:  (1) the Plaintiff could have brought its claims under

9

§502(a)(1)(B) of ERISA and (2) no other legal duty independent of ERISA is implicated by the Defendants' action.  See Davila, *supra*, at 2497; Pascack Valley Hospital, *supra*, at 400.  Because we conclude that UPMC's claims are predicated on legal duties allegedly independent of ERISA or the Whirley Plan, it necessarily follows that the claims are not completely preempted by § 502(a)(1)(B).

At the outset we note, as do the parties, that UPMC's claims are comprised of two elements:  allegedly improper discounts taken on the basis of prompt payment and allegedly improper discounts taken on the basis of charges in excess of what is reasonable and customary.  Because the parties have addressed each component separately, we will do the same.

With respect to the first component of UPMC's claims – prompt pay discounts – we find that Pascack Valley's reasoning supports UPMC's argument in favor of remand. It is true in this case, as it was in Pascack Valley, that the Plaintiff's breach of contract claims exist only because of the fact that the Hospital rendered treatment to a patient covered by an ERISA plan.  See 388 F.3d at 402.  However, the "crux" of the "prompt payment discount" dispute is whether Defendants breached provisions of the MOU; there is no contention that Defendants' rights and obligations relative to the prompt payment discount derive from the ERISA plan.  Thus, this portion of UPMC's claim depends entirely on the operation of an agreement independent of the Plan itself. Moreover, because the employee-participant in question was never a party to the MOU upon which UPMC sues, it is undisputed that the employee-participant could not have asserted UPMC's claim to recover the prompt payment discounts that were, allegedly, wrongfully taken.  Finally, insofar as the claim for recovery of prompt payment discounts is concerned, the dispute is not over the *right* to payment (i.e., coverage and eligibility under the Plan are not in dispute), but the *amount* or *level* of payment, which depends

10

on the terms of the MOU.[2]   See Pascack Valley Hospital, 388 F.3d at 403-04 (citation

omitted).   These factors lead us to conclude that UPMC's claim to recover the allegedly

improper prompt payment discounts is not preempted by § 502(a)(1)(B).

    We next consider that component of UPMC's claims which is premised on the

allegation that Defendants took improper discounts for amounts that Defendants

perceived to be in excess of "reasonable and customary" charges.   UPMC contends that

Defendants breached the Memorandum of Understanding when they hired a third party

to conduct an audit of UPMC's charges and deducted from payment those amounts they

considered to be excessive.   Under the terms of the MOU, which apply to Vantage's

"self-funded employer groups," the PPO (i.e. Vantage) is required to comply with

UPMC's "Chart Audit Policies," which are referenced as exhibits to the MOU.[3]   Those

policies strictly limit the conditions under which UPMC will submit to, or recognize, audits

of its records.   Because the audit conducted by Defendants failed to comply with

---

    [2] Although Defendant BSI admits that it availed itself of the prompt payment
discount, it denies that such discounts were taken pursuant to the terms of the MOU.
Instead, BSI suggests, the discounts were taken pursuant to a "customary course of
dealing" with UPMC.   (See Tr. of 3/31/05 Hearing [Doc. No. 15] at p. 22.)   However, as
we discuss more fully, infra, there is at least some evidence of record suggesting that
Vantage, the PPO which negotiated the pricing arrangement with UPMC, acted as
Defendants' agent (or with the apparent authority to conduct itself as Defendants'
agent) in entering into the MOU.   Regardless, even if we were to accept BSI's
representation at face value, it still bespeaks the existence of an implied agreement
with UPMC, the terms of which would give rise to enforceable legal rights and duties
quite independent of the ERISA Plan itself.   See, e.g., Crawford's Auto Center, Inc. v.
Com., Pennsylvania State Police, 655 A.2d 1064, 1066 (Pa. Cmwlth. 1995) ("An implied
contract is one where the parties assent to formation of a contract, but instead of being
expressed in words, the intention to incur an obligation is inferred from the conduct of
the parties in light of the surrounding circumstances, including the course of dealing.").
Thus, our analysis on this point would be no different.

    [3] When the MOU was originally made part of the record in this case, the Chart
Audit Policies were not included.   This Court has since directed that they be produced
and, because they form part of the basis of this Memorandum Opinion and Order, they
will be made part of the record.

UPMC's Chart Audit Policies, it is UPMC's view that the resulting deductions constitute a breach of the MOU. In short, UPMC maintains that this component of its breach of contract claim is premised upon legal duties independent of ERISA, thus defeating complete preemption.

Whirley contends that the factors discussed in <u>Pascack Valley Hospital</u> militate in favor of exercising federal jurisdiction in this case. Whirley first argues that the portion of UPMC's claim premised on allegedly improper discounts for excessive medical charges derives solely from the ERISA Plan, as opposed to the MOU. Whirley reasons that, because the Plan allows only for payment of charges which are "reasonable and customary," this dispute ultimately involves interpretation of the Plan document. We are not persuaded. To be sure, UPMC aims to recover full payment on its billed charges and, in that vein, it would likely argue that the amounts billed were both "reasonable" and "customary." Nonetheless, *as framed by the complaint*, the dispute is not whether, in fact, UPMC's charges were "reasonable and customary" within the meaning of the Plan, but whether Defendants had the right under the MOU to make deductions from UPMC's charges based on their unilateral determination that various charges exceeded that which is "reasonable and customary." (<u>See</u> Complaint ¶¶ 11, 16, 21, 25.) In sum, we find that UPMC's breach of contract claim is premised upon the terms of the MOU, a document which purports to create legal duties independent of the Plan.

Whirley next maintains that the employee in question who received treatment at UPMC and assigned UPMC his rights under the Plan could have brought suit himself to enforce full payment of UPMC's bills. Thus, Whirley seeks to distinguish this case from <u>Pascack Valley</u>, where the plan participants and beneficiaries were not parties to the Subscriber Agreement and therefore could not have sued under that agreement to enforce the rights that Pascack Valley Hospital was seeking to enforce. It is true, as was the case in <u>Pascack Valley</u>, that there is a "convergence" here between the Plaintiff's

breach of contract claims and a claim for benefits under § 502(a)(1)(B):

> Because the Plan is a reimbursement plan, the payments made to the Hospital *are* the benefits received by [the participants/beneficiaries] under the Plan. As a result, it would appear that any claims the Hospital could have obtained by assignment from [the participants/beneficiaries] would be for the same amount as the breach of contract claims that are the subject of this appeal. Moreover, had the Hospital successfully sued [the participants/beneficiaries] for the payments due, it would appear that any claims for reimbursement that [participants/beneficiaries] would have against the Plan would be claims for benefits under § 502(a). Indeed, one of the principal reasons why courts have allowed participants and beneficiaries to assign their claims under § 502(a) is to avoid the necessity of providers suing patients in the first instance.

388 F.3d at 404.

Ultimately, however, the legal duties that UPMC claims were breached derive not from the Plan, but from the terms of the MOU. It is implicitly, if not expressly, UPMC's theory that, in entering into the pricing agreement embodied in the MOU, and in consideration for the discounted rates offered by UPMC therein, Defendants agreed to assume certain legal obligations – among them, the duty to comply with UPMC's Chart Audit Policies in resolving potential payment disputes. That policy provides, *inter alia,* that all audits are restricted to the verification of charges, that UPMC will not discuss with any third-party auditor the "reasonableness" of any charge, that UPMC will not disclose financial data or reports regarding its costs or pricing policies to outside parties absent a contractual agreement with that party, and that requests for review of medical necessity will be addressed as a separate issue. (See Exhibit I, "Audit Policy" at II(D).) It is further UPMC's theory that Defendants materially breached the terms of the MOU and the Chart Audit Policies by conducting their own internal audit and withholding payment based on the results of that audit. When UPMC's claims are viewed in this light, it becomes apparent that they are not claims that could be asserted by the plan participant or beneficiary under § 502(a)(1)(B) of ERISA. Thus, the second factor discussed in

13

Pascack Valley weighs in favor of UPMC's motion for remand.

We further conclude that the third factor discussed in Pascack Valley likewise supports UPMC's position.  There does not appear to be any serious dispute here that the Whirley employee in question was eligible to receive benefits under the Whirley plan and that the services received through UPMC were covered by the plan.  Thus, as was the case in Pascack Valley Hospital, the dispute here "is not over the *right* to payment, which might be said to depend on the patient['s] assignment[] to the Hospital, but the *amount*, or level of payment.  388 F.3d at 403-04.

Whirley concedes that the dispute here is over the *amount* of payment due to UPMC, but it insists that determination of the amount due depends on the terms of the ERISA plan rather than the MOU, i.e., "was Whirley correct in its decision to conduct an audit of the UPMC bill and, if so, did the deducted charges fit within the definition of reasonable and customary set forth in the Plan."  (Whirley Indus.' Br. in Opp. to Pet. to Remand [Doc. No. 9] at p. 9.)  Once again, however, UPMC's claim is premised not upon the assertion that Defendants failed to pay all "reasonable and customary" charges due under the plan, but upon the assertion that Defendants' conduct breached the terms of UPMC's Chart Audit Policies, incorporated by reference into the MOU, when it withheld payments based upon its own internal audit of UPMC's bill.  Thus, resolution of UPMC's claims requires interpretation of the MOU and – as in Pascack Valley – the Plaintiff's "right to recovery, if it exists, depends entirely on the operation of [a]... contract[]" allegedly executed by the Defendants independently of the Plan itself.  388 F.3d at 402.  Otherwise stated, the Plan's provisions relative to payment of "reasonable and customary" charges are not an essential element of UPMC's breach of contract claims; they are instead an essential element of Whirley's and BSI's defense to the contract claims.  However, potential defenses, even when anticipated in the complaint, are not relevant under the well-pleaded complaint rule.  Pascack Valley Hospital, 388

14

F.3d at 399 (citing <u>Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S.</u>
<u>Cal.</u> 463 U.S. 1, 10-12 (1983)).

All of this is not to say that the Plan language is entirely irrelevant to the present
dispute.  As we have noted, the Hospital's claims against Defendants here exist only
because it provided medical services to an individual covered by Whirley's employee
benefit plan, <u>accord</u> <u>Pascack Valley Hospital</u>, 388 F.3d at 402, and in that sense, it might
be said that Plaintiff's claims "relate" to an ERISA plan within the meaning of § 514(a),
29 U.S.C. § 1144(a).  It may be true, therefore, that under ERISA's "conflict pre-emption"
provision, the federal common law of ERISA displaces state law in interpreting the terms
of the MOU.  <u>See</u> <u>id</u>. at 398 n. 4.  However, "[t]he possibility – or even likelihood – that
ERISA's pre-emption provision, 29 U.S.C. § 1144(a), may pre-empt the Hospital's state
law claims is not a sufficient basis for removal."  <u>Id</u>. at 398 (citing <u>Franchise Tax Bd. of</u>
<u>Cal. v. Constr. Laborers Vacation Trust for S. Cal.</u>, 463 U.S. at 12).

The Court acknowledges Defendants' argument that, because the Defendants
are not formal signatories to the MOU, that document cannot give rise to any
independent legal duties in this case.  Defendants also dispute whether the MOU is a
contract at all; according to Defendants, its terms are too indefinite to constitute any
legally enforceable agreement.  It appears that a similar attack was lodged regarding the
Subscriber Agreement at issue in <u>Pascack Valley Hospital</u>.  <u>See</u> 388 F.3d at 401 n. 8
(noting defendant's argument, *inter alia*, that it had no direct contractual relationship with
the Hospital).  Nonetheless, the Third Circuit declined to resolve the parties' disputes
concerning the merits (or lack thereof) of the plaintiff's breach of contract claims, noting
that – while the defendant's interpretation of the Subscriber Agreement might give rise to
certain affirmative defenses that would entitle it to judgment on the breach of contract
claims in a court of competent jurisdiction – "[i]t does not ... convert those breach of
contract claims into derivative claims for benefits under § 502(a)."  388 F.3d at 401.  The

15

Third Circuit's approach suggests that it is the nature of the Plaintiff's claims, as framed by the complaint, and not the merits of the claims, that determine whether the claims are removable.  See id. at 402 ("The Hospital's right to recover, *if it exists*, depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself.") (emphasis added).

In any event, however, there is evidence in the record which arguably belies the Defendants' contention that they are not bound by the terms of the MOU.  The Memorandum of Understanding expressly states that its terms shall apply to Vantage's self-funded employer groups – including, presumably, Whirley Industries and/or its Plan – "for covered services received at Provider."  In consideration for the prompt payment of its billed charges (and other terms and conditions), UPMC grants Defendants a discounted rate.  There is no dispute but that Defendants availed themselves of the discounted rate.  In addition, the record suggests that BSI viewed Vantage as its agent for purposes of procuring the discounted rate; BSI's "Provider Remittance Summary" forms state that "[c]harges have been processed based on a fee arrangement negotiated through Vantage Healthcare Network."  (See BSI's Br. Opposing Remand [Doc. 10] at Ex.s 2, 4.)  Alternatively, UPMC might argue that Vantage possessed apparent authority to act as Defendants' agent in negotiating the terms set forth in the MOU, thereby giving rise to legal obligations on their part.  See, e.g., Felix v. Fraternal Order of Police, Philadelphia Lodge No. 5, 759 A.2d 34, 39 (Pa. Cmwlth. 2000)("An entity's liability is not limited to such acts of its agents as are expressly authorized or necessarily implied, but extents [sic] to contracts negotiated by its agent acting within the apparent scope of authority.")  Further, we note that Whirley's Plan expressly encourages its participants to utilize the services of PPOs, including Vantage, in order to promote cost effective health care:

**PREFERRED PROVIDER ORGANIZATION (PPO)**

16

A Preferred Provider Organization (PPO) is a group of Hospitals, Physicians and other health care providers who have agreed to work with an organization to help control health costs by negotiating reduced fees.  The PPO helps employers contain the skyrocketing cost  of providing health benefits.  The PPO encourages Covered Persons to be cost-minded and help stabilize health care coverage costs both to you and to your benefit plan.  The PPO also protects your freedom to choose any Physician or Hospital you desire.  Alternatives to the PPO include reducing your benefits and increasing your cost.  The PPO is a much more attractive solution.  The PPO will save you money.  The PPO providers have agreed to charge cost-effective rates.  You can use any Physician and any health care facility that qualifies under your health plan the same as you have in the past.  You make the choice of using or not using a Preferred Provider each time you require services. .....

(Whirley Industries, Inc. Employee Benefit Plan, attached as Exhibit to Whirley Industries' Br. in Opp. to Pet. to Remand [Doc. 9], at p. 8.)  Taken together, the record at least provides fodder for an argument that the MOU – while perhaps not an integrated contract itself – comprises part of a contractual arrangement, independent of the Plan, whereby UPMC offers discounted rates for its medical services in exchange for (among other things) the Defendants' prompt payment of billed charges, Defendants' compliance with UPMC's chart audit policies, and Defendants' cooperation in encouraging plan participants and beneficiaries to choose PPO-affiliated hospitals (like UPMC).

For present purposes, we need not, and do not, decide the merits of either Plaintiff's contract claims or Defendants' defenses thereto.  As the parties seeking removal, Defendants bear the burden of proving that UPMC's claims against them are ERISA claims.  See Pascack Valley Hospital, 388 F.3d at 401.  Accordingly, Defendants bear the burden of demonstrating that the factors outlined in Davila and Pascack Valley Hospital are satisfied.  Because we find that Defendants have not satisfied their burden on this record, we will grant UPMC's motion to remand.  Defendants' attacks on the merits of UPMC's breach of contract claim, including their assertion that the document does not legally bind them, is more suitable for resolution in state court.  UPMC has disavowed any intention to proceed as an assignee-beneficiary under § 502(a)(1)(B) under ERISA.  Accordingly, as master of its own complaint, UPMC will stand or fall in state court on the merits of its contract claims.   See, e.g., Children's Hospital Corp. v.

17

<u>Kindercare Learning Center</u>, 360 F. Supp. 2d 202, 207 (D. Mass. 2005) ("[T]he fact that Children's Hospital could have sued as an assignee is not the test for complete preemption.  As a master of its own complaint, Children's Hospital had the right to assert independent causes of action regardless of the assignment.").

### III.  CONCLUSION

For the reasons set forth above, Plaintiff's motion to remand will be granted and Defendants' motion to dismiss will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UPMC PRESBY SHADYSIDE, | ) | |
| | ) | |
| Plaintiff, | ) | 1:05-cv-68 |
| v. | ) | |
| | ) | |
| WHIRLEY INDUSTRIES, INC., | ) | |
| et al., | ) | |

**O R D E R**

AND NOW, to wit, this 23nd day of September, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendants' motion to dismiss [Doc. # 2] is DENIED and Plaintiff's motion to remand [Doc. # 6] is GRANTED.  The Clerk is hereby directed to remand this case to the Allegheny County Court of Common Pleas forthwith.

s/     Sean J. McLaughlin
United States District Judge

cm:   All counsel of record.

19